# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| POWER-ONE, INC. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 2:05-CV-463 |
| | § | |
| ARTESYN TECHNOLOGIES, INC. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Artesyn Technologies, Inc.'s Renewed Motion for a Judgment as a Matter of Law and Alternative Motion for New Trial of Invalidity of the '125 Patent (Doc. No. 390, 396); Defendant Artesyn Technologies, Inc.'s Renewed Motion for a Judgment as a Matter of Law and Alternative Motion for New Trial of Invalidity of the '999 Patent (Doc. No. 391, 397); and various responses, replies and sur-replies. For the reasons discussed herein, Artesyn's motions are **DENIED**.

## BACKGROUND

Plaintiff Power-One, Inc. (hereinafter "Power-One") sued Defendant Artesyn Technologies, Inc. (hereinafter "Artesyn") for infringement of patents owned by Power-One.[1] In November of 2007, a jury found that Artesyn infringed Claims 1, 6, 15, 16, 17, 23, and 30 of the '125 patent, but did not infringe any claims of the '999 patent. The jury also found that Artesyn failed to prove by clear and convincing evidence that the claims of the '999 and '125 patents are invalid. At the close of trial, Artesyn moved for JMOL on the grounds that both patents are invalid for obviousness, and has renewed that motion herein.

---

[1] Originally Power-One asserted four patents, but two of the patents were dropped from the proceedings prior to trial.

## **LEGAL STANDARD**[2]

**I.     JMOL Standard**

"A motion for judgment as a matter of law...in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 235 (5th Cir. 2001). A court may therefore grant judgment as a matter of law (hereinafter "JMOL") for a party with regard to a particular issue when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1248 (Fed. Cir. 2005); *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005). A post-trial motion for JMOL should be granted only when the facts and inferences so conclusively favor one party "that reasonable jurors could not arrive at a contrary verdict." *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007) (citing *Tol-O-Matic, Inc. v. Proma Produkt-Und Mktg. Gesellschaft m.b.H.*, 945 F.2d 1546, 1549 (Fed. Cir. 1991)). "If reasonable persons in the exercise of impartial judgment could differ in their interpretations of the evidence, then the motion should be denied." *Id.*

In entertaining a motion for JMOL, the court must review the entire record, and must make all reasonable inferences for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court may not make credibility determinations or weigh the evidence when evaluating the record. *Id.* "[A]lthough the court should review the record as a whole, it must disregard any evidence favorable to the moving party that the jury is not required to believe." *Id.* "That is, the court should give credence to the evidence favoring the nonmovant as well as that

---

[2] "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004).

'evidence supporting the moving party this is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.*

## II.  New Trial Standard

"Under Rule 59(a) of the Federal Rule of Civil Procedure, a new trial may be granted to any party to a jury trial on any or all issues 'for any reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.'" *z4 Technologies, Inc. v. Microsoft Corp.*, 2006 WL 2401099, at *12 (E.D. Tex. 2006). "A new trial may be granted, for example, if the district courts finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Id.* (citing *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985)).

## **ANALYSIS**

A patent may be shown to be obvious, and therefore invalid, "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious as of the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); *TGIP, Inc.*, 527 F. Supp. 2d at 579. A determination of obviousness under § 103 is a legal question based on factual determinations. *Aguayo v. Universal Instruments Corp.*, 356 F. Supp. 2d 699, 720 (S.D. Tex. 2005). Obviousness is based on whether a "hypothetical person having ordinary skill in the art" with all prior art references would regard the subject matter of the invention as obvious. *Standard Oil Co. v. Am. Cyanamid*, 774 F.2d 448, 453-54 (Fed. Cir. 1985). "In review of a jury verdict on the ground of obviousness, the underlying findings of fact, whether explicit or presumed as necessary to support the verdict, are reviewed for substantial evidentiary support; and the ultimate question of

obviousness is reviewed for correctness in law, based on the factual premises." *Cardiac Pacemakers, Inc. v. St. Jude. Med., Inc.*, 381 F.3d 1371, 1375 (Fed. Cir. 2004).

The Supreme Court has outlined the framework for applying the statutory language of § 103 to any obviousness determination. According to the Supreme Court, obviousness depends on an objective analysis by the fact-finder of: (1) the scope and content of the prior art, (2) the differences between the claimed invention and the prior art, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations that give light to the circumstances surrounding the origin of the subject matter sought to be patented. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). The relevant secondary considerations that "might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented" in an obviousness determination include commercial success, long felt but unsolved needs, failure of others, and the presence or lack of some motivation to combine or avoid combining prior art teachings. *KSR Int'l Co. v. Teleflex Inc.*, —U.S.----, 127 S. Ct. 1727, 1734 (2007). In addition to the *Graham* factors and secondary considerations, the Court in *KSR Int'l* also stated that a court undertaking an obviousness analysis may consider "interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine known elements in the fashion claimed by the patent at issue." *Id.* at 1740-41. "While the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls. If a court, or patent examiner, conducts this analysis and concludes the claimed subject matter was obvious, the claim is invalid under § 103." *Id.* at 1734.

In applying these principles, the Supreme Court in *KSR Int'l* noted that "a patent composed

of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 1741. However, "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* According to *KSR Int'l*, the entirety of the obviousness inquiry should be expansive and flexible, and should account for common sense. *Id.* at 1739-42.

Artesyn had the burden of proving obviousness by clear and convincing evidence at trial. *Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007). The jury found both the '999 and '125 patent to be valid and non-obvious. "To prevail on its JMOL, [Artesyn] must now show that the evidence so conclusively favored [Artesyn] that reasonable jurors could not have reached that verdict." *TGIP, Inc.*, 527 F. Supp. 2d at 580 (citing *Tol-O-Matic, Inc.*, 945 F.2d at 1549).

Artesyn argues the prior art it presented at trial indicates that it was known and commonplace in the art to use digital serial communications to program, control, and monitor power supplies, including the class of power supplies known as switching DC-DC regulators, years before the '999 and '125 patents issued. As addressed primarily through its expert, Mr. Neal Stewart, Artesyn claims that evidence at trial shows the scope of the prior art was broad, the differences between the claimed invention and the prior art are minor, and the level of ordinary skill in the art is high. Given the alleged broad scope of the art and alleged minor differences between the prior art and the patented inventions, Artesyn argues the '999 and '125 patents are therefore obvious and invalid. Artesyn points to the following alleged prior art references presented at trial, which it claims support its allegations of obviousness:

- The SCPI Protocol Specification, which Artesyn claims sets forth standard digital

5

commands for use with a serial bus for programming, controlling and monitoring a variety of devices, including "power supplies." *See* DTX35. Artesyn claims SCPI discloses control commands (such as the "OUTput" command that turns the power supply on or off) for controlling the operation of a power supply, programming commands (such as the "Source Voltage" command for setting the output voltage of a power supply) for programming the operating characteristics of the power supply, and monitoring commands (such as the "Measure Voltage" and "Measure Current" commands for monitoring the output voltage and current of a power supply) for providing information concerning the operation of a power supply. Artesyn claims the teachings of SCPI concerning the use of digital serial communications to program, control and monitor power supplies are not limited to any specific class of power supplies, and therefore render obvious the use of digital serial commands for programming, controlling and monitoring all types of power supplies.

- The Linear Technology Design Note, which Artesyn claims teaches the use of digital serial communications to program, control and monitor the class of power supplies known as switching DC-DC regulators, specifically a DC-DC regulator that could be programmed over a digital serial bus known as the SMBus. *See* DTX530.

- The Melcher G Data Sheet, which Artesyn argues discloses the use of a digital serial bus with a small, switching DC-DC regulator that is disclosed as having a controller that can receive commands over the digital serial bus and can monitor data concerning the operation of the power conversion circuit in the regulator. *See* DTX406.

- The Summit "NEBS Complaint Board Level Power System" article, which Artesyn argues discloses a DC-DC regulator that received digital programming and control information over a serial data bus and in response controlled the operation of one or more switching DC-DC regulators. Artesyn claims the regulator discussed in the article provided monitoring information concerning the operation of the DC-DC regulators over the serial bus. *See* DTX419.

- U.S. Patent No. 6,396,169 (hereinafter "the '169 patent" or "the Voegeli patent"), which Artesyn claims discloses a power control system that includes (on a single circuit board) a power system controller, a plurality of switching DC-DC regulators that power various loads, and a digital communications bus coupling the system controller to the regulators (where programming control and monitoring information is provided across the bus). *See* DTX1; Trial Tr. at 7-12 (11/14/07 P.M.). Artesyn also argues the '169 patent specifically teaches that the digital bus may be an I²C digital serial bus. *See* DTX1.

- U.S. Patent No. 6,563,294 (hereinafter "the '294 patent" or "the Duffy patent"), which Artesyn argues is another example of a system including a central controller coupled to a plurality of DC-DC power converters by a digital serial bus where programming and control information is communicated from the controller to the DC-DC power converters over the digital serial bus. *See* DTX5; Trial Tr. (11/14/07 P.M.) at 13-16.

- The Teradyne Prototype, which Artesyn claims is a prior art device developed by an external consultant to Power-One, and is another example of digital serial

7

communications in a power control system using a system controller coupled to a serial data bus and a plurality of DC-DC regulators. *See* Trial Tr. at 93-94, 99-100 (11/14/07 A.M.).

After reviewing the record and considering Artesyn's arguments, the Court finds substantial evidence in the record supporting the jury's factual findings on validity, and the Court also finds that Artesyn failed to meet its burden at trial of establishing obviousness by clear and convincing evidence. Both sides presented their evidence of obviousness and nonobviousness primarily through the testimony of their respective expert witnesses. While Artesyn's expert, Mr. Stewart, testified that Power-One's invention was inevitable based on the prior art and the trend of the technology at issue to become "smaller, faster, cheaper," Power-One's expert also reviewed the relevant prior art and stated unequivocally that a person of ordinary skill in the art would not have considered the inventions obvious. While Artesyn argues that the differences between the prior art and the patented inventions presented at trial were minor, the jury also heard substantial conflicting testimony from Power-One's witnesses and its expert, Dr. Mark Ehsani, outlining significant differences between the prior art and the claimed invention. For example, Dr. Ehsani and other witnesses testified to the following differences between the prior art and the invention:

- Regarding the SCPI Protocol Specification, Power-One elicited testimony from Mr. Stewart, Artesyn's expert, that SCPI is just a protocol language, not a power supply, POL, software, or DC-DC converter. Trial Tr. at 97:1-10 (Nov. 14, 2007 (P.M.)). Mr. Stewart also testified that SCPI language was designed to control box-like pieces of test gear, not the board-mounted power supplies that are the subject of the patents. Trial Tr. at 97:20-98:6 (Nov. 14, 2007 (P.M.)). Mr. Stewart, who is a board-level

power designer, also admitted that neither he nor his company had ever designed or manufactured embedded power supplies that communicated through the SCPI protocol. Trial Tr. at 102:5-103:14 (Nov. 14, 2007 (PM)). Furthermore, Power-One witnesses noted that SCPI's stated goal was to "reduce the Automatic Test Equipment (ATE) Program development time," and that the use of SCPI in test devices such as the Agilent system did not "suggest doing board-level power management using smart POLs," which is the subject of the asserted patents. DTX35 at 11696; Trial Tr. at 54:14-55:3 (Nov. 7, 2007 (P.M.)).

- Regarding the Linear Technology Design Note,[3] Dr. Ehsani testified that the datasheet did not disclose the smart POL invention of Power-One's patents. Trial Tr. at 45:2-4 (Nov. 7, 2007 (PM)). Dr. Ehsani testified to his conclusion after pointing out a number of differences between the Design Note and the asserted patents. First, Dr. Ehsani noted that the Design Note discloses a controller chip that did not use a serial bus to control any of the DC-DC converters, and instead used simple on / off controls. Trial Tr. at 44:5-8 (Nov. 7, 2007 (PM)), DTX530 at Fig. 2. Also, Dr. Ehsani testified that the Design Note did not disclose or allow for monitoring information to be sent over the serial bus regarding information about the DC-DC converters. Trial Tr. at 44:23-45:1 (Nov. 7, 2007 (PM)); DTX530 at Fig. 2. Furthermore, Dr. Ehsani also testified that the controller chip in the Linear Design Note had no addressing lines, and therefore one could not connect multiple chips to

---

[3] Power-One also notes in its response that Artesyn never proved the Linear Technology Data Sheet was in fact prior art, since there was no evidence when the article was published in a printed publication.

> a common serial bus. Trial Tr. at 137:5-138:3 (Nov. 8, 2007 (AM)).

- Regarding the Melcher G Data Sheet, Dr. Ehsani testified that the chief difference between the Melcher G Data Sheet and the asserted patents was that the Melcher G was a brick, and was not intended to be used near a load or operate as a POL. *See* Trial Tr. at 55:4-56:12, 59:3-6 (Nov. 8, 2007 (AM)); Trial Tr. at 47:2-17 (Nov. 7, 2007 (PM)). Dr. Ehsani also testified that the Melcher G lacked the addressability required to use it with a plurality of like devices (such as recited in claim 1 of the '125 patent), and that the Melcher G could not control the output of the device or program any timing of that output. *See* Trial Tr. at 47:18-48:4 (Nov. 7, 2007 (PM)); Trial Tr. at 46:14-47:1 (Nov. 7, 2007 (PM)).

- For the Summit NEBS Article, there was testimony that the Summit References showed only enable lines to the power-supplies, not serial data buses. Trial Tr. at 37:8-43:12 (Nov. 7, 2007 (PM)). Other differences discussed at trial included that the DC-DC regulators in the Summit Reference did not receive any programming information from a data bus; that the power-supplies in the Summit Reference were bricks, not POLs (and the hot-swap application shown in the reference would have required bricks); and that the power supply in the Summit Reference did not use any slew-rate data.[4] *See* Trial Tr. at 84:16-19 (Nov. 14, 2007 (PM)); Trial Tr. at 37:8-

---

[4] Artesyn's expert agreed when asked, with regard to Summit, "[a]nd this is, in fact, the prior art that's disclosed on the face of the patent. You have analog control with lots of external circuitry in order to control dumb power supplies, whereas the invention is about building a smart POL and do without all that external circuitry?" Trial Tr. at 123:1-17 (Nov. 14, 2007 (PM)). Mr. Stewart later argued he could turn Summit into a POL, and proceeded to outline certain steps that he could take to turn the Summit teaching into a POL. However, Mr. Stewart was unable to offer any clarification on why one would have thought it obvious to take the steps he suggested to turn Summit's teachings into the patented invention in 2001. Trial Tr. at 123:11-129:8 (Nov. 14, 2007 (PM)).

43:12 (Nov. 7, 2007 (PM)); Trial Tr. at 122:3-20 (Nov. 14, 2007 (PM)). There was also testimony that Summit's disclosed serial data bus was "on the wrong side of power supplies and has no bearing on [the] invention," and that "[t]he Summit controller [did] not have a serial communication bus for the purposes of communicating with power supply, which is what [the] invention is about." Trial Tr. at 190:9-13 (Nov. 8, 2007 (PM)). Moreover, the patent issued over prior art before the examiner that "captures all of the major elements of the solutions shown in the Summit diagram."[5] Trial Tr. at 165:23-166:3 (Nov. 8, 2007 (PM)). Finally, the Summit Reference is dated October 20, 2002, while Power-One presented testimony that it conceived the patents (and gave a presentation reflecting that conception) on August 23, 2001, before the Summit References. *See* Trial Tr. at 12:12-17:18 (Nov. 8, 2007 (PM)).

- Dr. Ehsani testified that the '169 Voegeli Patent did not show a distributed board-level power architecture, that the '169 patent disclosed brick power supplies instead of smart POLs, discussed how any sequencing (to the extent there is any) would be in the power controller, and discussed how the power supplies were enabled by control lines rather than commands on a bus. Trial Tr. at 50:5-52:10 (Nov. 7, 2007 (PM)). Ultimately, Dr. Ehsani testified that the '169 Voegeli Patent did not disclose

---

[5] As noted in Footnote 4, Artesyn's expert agreed with the statement that the Summit Reference "is, in fact, the prior art that's disclosed on the face of the patent." Trial Tr. at 123:1-7 (Nov. 14, 2007 (PM)). While the Court disagrees with Power-One's assertion that the figures on the face of the patent make Summit cumulative to the prior art before the examiner, it is worth noting that the PTO considered the major teachings of Summit and still found the patents non-obvious at the time.

- the patented invention.[6] Trial Tr. at 51:13-52:10 (Nov. 7, 2007 (PM)).

- Regarding the '294 Duffy Patent, Dr. Ehsani testified that the power system controller in the '294 Duffy Patent is not the controller that is the subject of the claims in the asserted patents because it is inside the power supply. *See* Trial Tr. at 143:23-144:3 (Nov. 8, 2007 (AM)); Trial Tr. at 67:4-25 (Nov. 8, 2007 (AM)).

- Finally, regarding the Teradyne Prototype, the evidence showed significant differences in size, structure, and use between Teradyne and the asserted patents. Teradyne was a large, high-power box-type AC-DC power system that was mounted in its own chassis, while Power-One's product was much smaller. Trial Tr. at 101:10-102:5 (Nov. 14, 2007 (AM)); Trial Tr. at 90:12-91:1 (Nov. 6, 2007 (PM)). Moreover, Artesyn's expert did not testify that Teradyne invalidated the asserted patents.

These differences between the asserted patents and relevant prior art are not minor differences. For example, side-by-side pictures of the Teradyne prototype and Power-One's ZY7115 POLs (the product encapsulating the patented invention) reveal significant differences in the products that support Power-One's assertion that Teradyne was intended for very different purposes than Power-One's invention.[7] As another example, while Artesyn places great emphasis on the SCPI

---

[6] Power-One also argues that Artesyn's expert conceded that the '169 Patent teaches away from the use of a communication bus and toward the use of dedicated lines. *See* Trial Tr. at 144:24-145:4 (Nov. 14, 2007 (PM)).

[7] The Court recognizes that in an infringement context, the accused product is compared to the patent claims. However, the Supreme Court in *KSR Int'l* emphasized that courts should take a flexible and common sense approach to the obviousness inquiry, and under a common sense approach, the differences between Teradyne and Power-One's invention are especially apparent when viewing pictures of the two products. Those visual differences are useful as part of the totality of the obviousness inquiry, as they underscore the arguments over the conceptual differences between the products at the appropriate point in time.

protocol as invalidating Power-One's patents as obvious, Artesyn's own expert testified that his company had never designed a POL that could communicate through the SCPI protocol.[8] For the Summit reference, Mr. Stewart's testimony indicated he changed the teaching of the reference to arrive at his conclusion that Summit disclosed a POL. *See* Trial Tr. at 125:6-129:5 (Nov. 14, 2007 (PM)) (discussing how Summit taught an isolated product, while the application of a POL is non-isolated). When looking at all of the differences on the whole, there is ample evidence in the record to support the jury's verdict, and the Court finds the differences between the prior art references and the patented invention to be significant.

Regarding the scope of the prior art, there are disputes about the relevance to an obviousness determination of a few of the prior art references. For example, there were questions raised by Power-One over whether some of the references can even be considered prior art given dates of publication in relation to conception of the invention (the Summit Reference),[9] and whether another reference was even published or widely disseminated at all (the Linear Technology Design Note). There is also a dispute over whether any witnesses even argued at trial that certain art invalidates the patents (the Teradyne Prototype). These questions not only limit the value of these particular references to the obviousness inquiry, but also further limit the scope of the prior art as a whole.

---

[8] Mr. Stewart claimed that cost was the reason his company never designed a product with SCPI digital interfaces to program, control, and monitor power supplies. Trial Tr. at 102:5-103:15 (Nov. 14, 2007 (PM)).

[9] The Court is treating Summit as prior art for purposes of this motion. Nonetheless, there are a number of problems with Summit as a prior art reference, not the least of which are the questions over whether or not the invention was conceived and thereafter diligently reduced to practice prior to Summit's publication. The jury was instructed on conception of the invention, and could have chosen to disregard Summit in its conclusion that the patent was valid. In addition, Power-One also argued that the prior art figures on the face of the patent disclose all of the major features of Summit's teaching, and that the PTO issued the patent over those teachings, indicating the PTO largely considered Summit when issuing the patent. Despite these problems, the Court will fully credit Summit as prior art for this motion.

Even fully crediting all of the references that Artesyn argued invalidate the patent at trial as prior art, seven references is by no means a broad scope of prior art. Therefore, the Court finds the scope of the prior art to be somewhat limited. With a limited scope of the prior art, and not insignificant differences between the prior art and the asserted patents, the jury could have credited Dr. Ehsani and other Power-One witnesses' testimony indicating that the relevant prior art would not have made it obvious to one of ordinary skill in the art to conceive of the inventions in the asserted patents.

In addition to the limited scope of the prior art and the significant differences between the prior art and the patents, there were a number of other problems with Artesyn's obviousness case. It was not entirely clear at trial how the art would work together to make it obvious to arrive at the invention in the patents. Other than Mr. Stewart's mantra that the patented inventions were inevitable because technology of this sort is constantly becoming "smaller, faster, cheaper," the evidence suggesting how one of ordinary skill in the art would put together the asserted prior art and arrive at Power-One's invention was simplistic, disjointed and conclusory.[10] Though *KSR Int'l* no longer mandates presentation of evidence of a motivation or suggestion to combine prior art references, it is nonetheless still helpful to judge and jury to have an expert explain in an organized and coherent manner why it would have been obvious to one of ordinary skill in the art to combine the prior art and arrive at the invention. *TGIP, Inc.*, 527 F. Supp. 2d at 580-81.

---

[10]

Mr. Stewart referred to the complex technical differences between the prior art references and the patented inventions as "peanuts" on multiple occasions. *See, e.g.,* Trial Tr. at 133:9-12 (Nov. 14, 2007 (AM)) (describing a POL, one of the central technical features at issue, as "peanuts"). Rather than respond with a reasoned explanation when asked specifically about whether the Summit Reference would teach one of ordinary skill in the art to build Power-One's invention, Mr. Stewart responded simply that it was the "same peanuts." *See* Trial Tr. at 138:5-10 (Nov. 14, 2007 (AM)). Artesyn relied heavily upon the Summit reference in multiple aspects of their invalidity presentation. Mr. Stewart's simplistic and conclusory responses of this type offered little to the dialogue between the parties' experts on the obviousness issue. The jury could have chosen to believe Dr. Ehsani's more detailed testimony, which elaborated extensively on his conclusions, when making their factual determinations on the obviousness issue.

Also, Mr. Stewart's testimony on how he could turn the relevant pieces of prior art into parts of the asserted patents (such as POLs) often involved multiple complex steps. *See, e.g.,* Trial Tr. at 123:11-129:8 (Nov. 14, 2007 (PM)). Taking multiple complex steps in hindsight to arrive at an invention is intuitively at odds with a conclusion that an invention was obvious at the time of invention. While Mr. Stewart may have felt in hindsight that it was obvious and inevitable to take the steps he suggested, he did not elaborate on why one would have thought it obvious to take the steps he suggested and arrive at the patented inventions.[11] *See* Trial Tr. at 123:13-129:8 (Nov. 14, 2007 (PM)) (Stewart testifying that he could not name a person who would have considered taking the steps he suggested using the Summit Reference to arrive at the invention).

Power-One also provided substantial evidence at trial that Artesyn did not view Power-One's inventions as obvious until recently. Artesyn touted its DPL20C, the infringing product in this case, as "enabl[ing] the customer to communicate, configure and monitor a variety of different converter functions *which in the past was just not an option* or required separate and specialised silicon for this to be achieved." *See* PTX804 (emphasis added). Artesyn also claimed the DPL20C "[made] it easy for [its] customer & provides real benefits" over the prior art solutions. *Id.* When evidence is before the Court indicating the Defendants touted their own infringing product as an advance in the industry, "common sense informs the Court that the [patents-at-issue] would not have been obvious" to a person with ordinary skill in the art. *Boston Scientific Corp. v. Johnson & Johnson*, 2008 WL 480193, at *10 (N.D. Cal. 2008).

The secondary considerations also support the conclusion that Power-One's invention was

---

[11] Power-One also notes that the jury may have simply believed Dr. Ehsani's testimony over Mr. Stewart's because Mr. Stewart himself could be perceived as biased. It was noted at trial that Mr. Stewart founded a sister company to Artesyn, and became very wealthy when Emerson Electric acquired Astec (the company Mr. Stewart founded).

15

not obvious. Power-One presented evidence of praise in the industry for its product, and specifically introduced evidence of praise directly from Artesyn indicating Artesyn regarded the features of Power-One's patented product as "pretty good stuff." Trial Tr. at 44:4-46:14, 60:17-62:21 (Nov. 13, 2007 (PM)). Power-One presented testimony at trial that the praise from the industry specifically related to the features of the patented invention (such as the architecture comprising a power manager that is controlling and programming point of loads through the serial bus), which provided the necessary nexus between the industry praise and the patented invention to allow the industry praise to be considered in the determination of nonobviousness. *See Demaco Corp v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988); Trial Tr. at 54:9-56:13 (Nov. 8, 2007 (PM)). One Artesyn employee who testified at trial (and was present at meetings between Power-One and Artesyn where Power-One presented the commercial embodiment of its patents to Artesyn officials) recalled that he felt Power-One had done "really wonderful engineering work," and described Power-One's commercial embodiment of the patents as "sophisticated." Trial Tr. at 51:14-55:19 (Nov. 13, 2007 (PM)). While Artesyn argues against the Power-One's commercial success now, at the time Artesyn was interested enough in Power-One's product (which was based on the patents at issue) that it met with Power-One shortly after the announcement of the product to discuss licensing Power-One's technology. Trial Tr. at 54:17-55:24 (Nov. 13, 2007 (PM)); PTX334. On the whole, Power-One presented a substantial amount of evidence indicating Artesyn and the industry as a whole viewed Power-One's inventions as an advance in the field. *See* Trial Tr. at 157:5-8 (Nov. 8, 2007 (AM)) (testimony from engineer of a different company indicating he was impressed with the features of Power-One's product embodying the patents). Substantial evidence of praise from the industry for the patented invention, and specifically praise from a competitor and

opposing litigant, tends to "indicat[e] that the invention was not obvious in light of the prior art." *See Altech Controls Corp. v. Eil Instruments, Inc.*, 8 F. App'x 941, 950 (Fed. Cir. 2001).

As another secondary consideration, Power-One also presented evidence indicating that Artesyn copied the invention. Copying of the invention by others is considered a secondary consideration courts must take into account when determining obviousness. *See Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1092 (Fed. Cir. 1987). Specifically, Power-One presented substantial evidence indicating Artesyn was aware of the concepts of Power-One's invention when it began its project that led to the creation of the DPL20C infringing product. Trial Tr. at 79:18-89:2 (Nov. 14, 2007 (AM)) (testimony from Artesyn employee charged with heading up Artesyn's "Intelligent Bus Project" stating he was aware of the concepts underlying Power-One's invention while working on Artesyn's infringing product); PTX744; PTX812; PTX827. Though Artesyn disputes that it copied, the evidence of copying was sufficient enough that a reasonable jury could easily have chosen to believe Power-One's presentation of the evidence and factored that into their determination that Artesyn's product infringed Power-One's patents and that Power-One's patents were valid.

In sum, the trial record shows the secondary considerations, particularly the praise from the industry, indicate Power-One's invention was not obvious. The record also shows that the scope of the prior art is limited to seven references, and there are significant differences between the claimed invention and the prior art. Accordingly, the Court finds that Artesyn failed to show by clear and convincing evidence that one of ordinary skill in the art would have found Power-One's invention obvious in light of the prior art presented at trial. In ruling on a motion for JMOL, the Court does not make credibility determinations and must draw all reasonable inferences in the light most

favorable to the verdict. *TGIP, Inc.*, 527 F. Supp. 2d at 581. Artesyn also failed to show that the evidence points so conclusively in favor of a finding of obviousness that reasonable jurors could not arrive at a contrary verdict. *Id.* (citing *Tol-O-Matic*, 945 F.2d at 1549). The Court also finds no reason that a new trial would be necessary.

## CONCLUSION

For the reasons stated above, Artesyn Technologies, Inc.'s Renewed Motion for a Judgment as a Matter of Law and Alternative Motion for New Trial of Invalidity of the '125 Patent (Doc. Nos. 390, 396), and Defendant Artesyn Technologies, Inc.'s Renewed Motion for a Judgment as a Matter of Law and Alternative Motion for New Trial of Invalidity of the '999 Patent (Doc. No. 391, 397) are **DENIED**.

**So ORDERED and SIGNED this 11th day of April, 2008.**

_____
JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE